**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

MARSHA B.,

      *Plaintiff,*

v.

COMMISSIONER OF SOCIAL
SECURITY,

      *Defendant.*

_____/

Case No. 5:25-cv-13017

Judith E. Levy
United States District Judge

Patricia T. Morris
United States Magistrate Judge

**REPORT AND RECOMMENDATION ON**
**CROSS-MOTIONS FOR SUMMARY JUDGMENT (ECF Nos. 7, 12)**

**I.     RECOMMENDATION**

For the reasons set forth below, it is recommended Plaintiff's motion for summary judgment (ECF No. 7) be **GRANTED IN PART** and Defendant Commissioner of Social Security's motion for summary judgment (ECF No. 12) be **DENIED**. The final decision of the Administrative Law Judge (ALJ) should be **VACATED** and this matter **REMANDED** for further proceedings consistent with this opinion pursuant to sentence four of 42 U.S.C. § 405(g).

**II.    REPORT**

    **A.    Introduction and Procedural History**

On August 1, 2023, Plaintiff filed an application for disability insurance

1

benefits, alleging disability beginning June 1, 2023. (ECF No. 5-1, PageID.30). The Commissioner initially denied the application on November 30, 2023, and on reconsideration on March 19, 2024. (*Id.*). Plaintiff then requested a hearing before an ALJ, which was held on September 16, 2024. (*Id.* at PageID.30, 53–89). The ALJ issued a written decision on October 9, 2024, finding that Plaintiff was not disabled. (*Id.* at PageID.27–48). Following the ALJ's decision, Plaintiff requested review from the Appeals Council, which denied the request on August 14, 2025. (*Id.* at PageID.16–20).

Following the denial of review, Plaintiff sought judicial review on September 24, 2025. (ECF No. 1). The parties have filed cross-motions for summary judgment for which briefing is complete. (ECF Nos. 7, 12, 13).

## B. Standard of Review

District courts have jurisdiction to review the Commissioner's final administrative decisions pursuant to 42 U.S.C. § 405(g). The review is restricted solely to determining whether "the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Sullivan v. Comm'r of Soc. Sec.*, 595 F. App'x 502, 506 (6th Cir. 2014) (citation modified). Substantial evidence is "more than a scintilla of evidence but less than a preponderance." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (citation modified). "[T]he threshold for such evidentiary sufficiency is

not high." *Biestek v. Berryhill*, 587 U.S. 97, 103 (2019). "It means—and means only—such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (citation modified).

A district court must examine the administrative record as a whole, and may consider any evidence in the record, regardless of whether it has been cited by the ALJ. *See Walker v. Sec'y of Health & Hum. Servs.*, 884 F.2d 241, 245 (6th Cir. 1989). Courts will "not try the case de novo, nor resolve conflicts in the evidence, nor decide questions of credibility." *Cutlip v. Sec'y of Health & Hum. Servs.*, 25 F.3d 284, 286 (6th Cir. 1994). "If the [Commissioner's] decision is supported by substantial evidence, it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Id.* (citation modified).

## C.    Framework for Disability Determinations

Disability benefits are available only to those with a "disability." *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). "Disability" means the inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A).

The Commissioner's regulations provide that disability is to be determined

through the application of a five-step sequential analysis:

> (i) At the first step, [the ALJ] consider[s] [the claimant's] work activity, if any.  If [the claimant is] doing substantial gainful activity, [the ALJ] will find that [the claimant is] not disabled.
>
> (ii) At the second step, [the ALJ] consider[s] the medical severity of [the claimant's] impairment(s).  If [the claimant] do[es] not have a severe medically determinable physical or mental impairment that meets the duration requirement . . . or a combination of impairments that is severe and meets the duration requirement, [the ALJ] will find that [the claimant is] not disabled.
>
> (iii) At the third step, [the ALJ] also consider[s] the medical severity of [the claimant's] impairment(s).  If [the claimant has] an impairment(s) that meets or equals one of [the] listings in appendix 1 of this subpart and meets the duration requirement, [the ALJ] will find that [the claimant is] disabled.
>
> (iv) At the fourth step, [the ALJ] consider[s] [his or her] assessment of [the claimant's] residual functional capacity and . . . past relevant work. If [the claimant] can still do . . . past relevant work, [the ALJ] will find that [the claimant is] not disabled.
>
> (v) At the fifth and last step, [the ALJ] consider[s] [his or her] assessment of [the claimant's] residual functional capacity and . . . age, education, and work experience to see if [the claimant] can make an adjustment to other work.  If [the claimant] can make an adjustment to other work, [the ALJ] will find that [the claimant is] not disabled.  If [the claimant] cannot make an adjustment to other work, [the ALJ] will find that [the claimant is] disabled.

20 C.F.R. § 404.1520(4); *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534

(6th Cir. 2001).

"Through step four, the claimant bears the burden of proving the existence

and severity of limitations caused by [his or] her impairments and the fact that [he

4

or] she is precluded from performing [his or] her past relevant work." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 474 (6th Cir. 2003).  The claimant must provide evidence establishing his or her residual functional capacity (RFC), which "is the most [the claimant] can still do despite [his or her] limitations," and is assessed using "all the relevant evidence in [the] case record."   20 C.F.R.  §§ 404.1545(a)(1), 416.945(a)(1).

The burden transfers to the Commissioner if the analysis reaches the fifth step without a finding that the claimant is not disabled. *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006).  At the fifth step, the Commissioner is required to show that "other jobs in significant numbers exist in the national economy that [the claimant] could perform given [his or] her RFC and considering relevant vocational factors." *Rogers*, 486 F.3d at 214 (citing 20 C.F.R. §§ 416.920(a)(4)(v), (g)).

### D.   ALJ Findings

Following the five-step sequential analysis, the ALJ determined Plaintiff was not disabled.

At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity from her alleged onset date of June 1, 2023, though her date last insured of June 30, 2024.  (ECF No. 5-1, PageID.33).

At Step Two, the ALJ found the following impairments severe: degenerative

changes of the lumbar spine, degenerative and post-surgical changes of the cervical spine, cervical stenosis with radiculopathy status post-fusion, diabetes mellitus, sclerotic changes of the left pelvis and arthritic changes of the sacroiliac (SI) joints, plantar fascial fibromatosis of right ankle, migraines, myofascial pain syndrome, polyarthritis, nondisplaced fracture of the ribs, right biceps tendonitis, right shoulder impingement status post arthroscopy, right artery stenosis, obesity, depressive disorder, anxiety disorder, and posttraumatic stress disorder (PTSD). (*Id.*). At Step Three, the ALJ found none of the impairments, either independently or in combination, met or medically equaled in severity or duration the criteria of any listing. (*Id.*).

Next, the ALJ found Plaintiff had the RFC

to perform light work as defined in 20 CFR 404.1567(b) except the claimant could lift and/or carry 20 pounds occasionally and 10 pounds frequently. The claimant could occasionally climb ladders, ropes, or scaffolds. The claimant could occasionally climb ramps and stairs. The claimant could frequently balance as that term is defined by the Selected Characteristics of Occupations. The claimant could occasionally stoop, kneel, crouch, and crawl. The claimant could frequently reach, handle, and finger with both upper extremities. The claimant could understand, remember, and carry out simple instructions. There could be no production rate work, such as work on an assembly line. There could be occasional changes in a routine work setting. There could be occasional interaction with coworkers, supervisors, and the public.

(*Id.* at PageID.37).

At Step Four, the ALJ found that Plaintiff was unable to perform any past

relevant work.  (*Id.* at PageID.42).  However, the ALJ found other jobs in the national economy that Plaintiff could perform.  (*Id.*).  Specifically, the ALJ found that Plaintiff could perform the requirements of a blood donor unit assistant (76,000 jobs in the national economy), a cleaner housekeeper (50,000), and a mail sorter (85,000).  (*Id.* at PageID.43).  The ALJ thus concluded that Plaintiff was "not disabled."  (*Id.*).

### E.    Administrative Record

Plaintiff raises three issues on appeal.  First, she argues the ALJ erred by mischaracterizing Plaintiff's treatment as conservative.  Next, she argues that the ALJ improperly evaluated Plaintiff's subjective reports of symptoms.  Finally, Plaintiff argues that the ALJ erred in relying on the Vocational Expert's testimony because it was inconsistent with the RFC.

As will be explained below, the Undersigned finds that Plaintiff's first two arguments are meritorious and warrant remand.  The Undersigned thus need not reach Plaintiff's third argument. *See Jandt v. Saul*, No. 1:20-CV-00045, 2021 WL 467200, at \*11 (W.D. Ky. Feb. 9, 2021) ("Considering the conclusion reached above, the Court declines to address Plaintiff's other challenges to the final decision of the Commissioner.").  While the Undersigned has reviewed the entire record, she will only summarize the evidence relevant to Plaintiff's first two issues on appeal.

On May 10, 2023, a few weeks before her alleged onset date, Plaintiff had a

follow-up appointment with an orthopedic surgeon regarding her right shoulder pain.

(ECF No. 5-1, PageID.439).  The orthopedic surgeon noted:

> She has had right shoulder problems for a while now and a [history] [of] a greater tuberosity fracture in 2022.  Conservative measures include: cortisone injections, PT, MRI and OTC oral analgesics. Despite the conservative measures she has tried, she is continuing to not improve and is becoming severely limited.  She reports she has become very limited at work and affecting her ability to do the tasks required for work.  She is ready to go [forward] with the right shoulder arthroscopy, as the conservative measures are no longer providing her any relief.  She has surgery tentatively scheduled for 06/12/2023.  She reports her [blood sugar] levels are fluctuating, but more stable.

(*Id.*).  At her preoperative evaluation, the orthopedic surgeon indicated that Plaintiff would be going to the diabetes clinic due to her "uncontrolled A1c" and recent diagnosis of hypoplastic pancreas.[1]  (*Id.* at PageID.447).  He stated that Plaintiff would "be placed on an insulin pump prior to surgery."  (*Id.*).  Plaintiff's surgery proceeded as scheduled on June 12.  (*See id.* at PageID.455)

At her June 27 postoperative appointment, Plaintiff presented in an arm sling and reported that she was "doing reasonably well so far."  (*Id.*).  Plaintiff was instructed to proceed with PT to work on her range of motion, to take Tylenol and/or Motrin as needed for pain, return for a follow-up visit in six weeks, and return to work in eight weeks.  (*Id.* at PageID.459).  Plaintiff returned for an appointment sooner than expected on July 12 because she "reinjured her shoulder this past week

---

[1] "This describes a pancreas that doesn't fully develop."  https://www.chop.edu/conditions-diseases/pancreatic-malformations (last visited June 12, 2026).

when she was pulling up on a strap for [a] saddle." (*Id.* at PageID.463). Plaintiff reported "pain in the front side of her shoulder." (*Id.*). On examination, there was "[t]enderness along the anterior shoulder and biceps" but no major abnormities. (*Id.*). The orthopedic surgeon "suspect[ed] that she irritated the repair of her biceps" but that "[s]ince there is no Popeye's deformity at this point it is possible that this is still intact." (*Id.*).

Plaintiff returned for her scheduled follow-up appointment on August 15, reporting that "she ha[d] been feeling a pulling sensation, but otherwise only ha[d] a pain of 2/10. She [was] hoping to start [bowling] again." (*Id.* at PageID.471). Plaintiff was instructed to continue Motrin and/or Tylenol as needed and to return in three months unless problems arose. (*Id.* at PageID.475). She returned less than a month later because, while she was "happy with her overall progress since procedure" and "pleasantly surprised how good her range of motion is," she was continuing to experience discomfort, pain, and numbness that fluctuated based on activity. (*Id.* at PageID.478). Plaintiff had not begun PT, saying that she already knew the exercises and got "her therapy working on the farm." (*Id.*). She had continued to take Motrin when needed. (*Id.*). The orthopedic surgeon recommended that she try "formal PT if pain or discomfort persist," continue to take over-the-counter painkillers as needed, and referred her to another physician for evaluation of her right wrist due to pain that was "persistently getting worse." (*Id.* at PageID.482).

9

On November 20, 2023, Plaintiff underwent a mental status examination with a consulting psychologist, during which she described her physical impairments and their impact on her functioning.  (*Id.* at PageID.496–502).  Of note, Plaintiff reported that she was "fearful of getting shots and hence ha[d] not been getting insulin" to manage her diabetes.  (*Id.* at PageID.498).  Plaintiff also reported that her recent work attempts had been unsuccessful due to "pain and lack of motion/flexibility/ strength."  (*Id.* at PageID.499).  She described her typical activities as follows:

> [Plaintiff] begins her typical day by awakening at 4:30 in the morning. It takes her 2 hours to get ready to go to work.  She works until 5 o'clock in the evening.  When she returns home, she sits on a couch and does not get up unless she has too.
>
> [Plaintiff] rarely vacuums, sweeps the floor, or cleans the bathroom. She, however, can do those chores.  It takes her 2 days to do a load of laundry.  It takes her 3 or 4 hours to do 2 sinks full of dirty dishes.  She can drive and shop.  She does a little cooking.  She does not mow the lawn or shovel snow.

(*Id.*).

Based on Plaintiff's attitude and behavior, the psychologist "did not conclude that she was exaggerating or minimizing her symptoms."  (*Id.*).  He later said that Plaintiff

> was highly anxious, fearful, and despondent.  She has at times felt overwhelmed with her symptoms and health issues.  She was very frustrated.  I did not perceive her to be resistant or defiant.  She did not appear to be exaggerating her symptoms.  She was not suspicious or mistrustful.  Her affect was appropriate and sufficiently controlled.

(*Id.* at PageID.500).

On February 5, 2024, Plaintiff completed a function report wherein she responded to prompts about how her impairments limited her activities. (*Id.* at PageID.317–24). Plaintiff explained:

> Main complaint at this time is the debilitating back pain that incapacitates her. If she has to stand for more than 2 hours in a day, she will have significant pain, such that she is unable to do anything for the rest of that day and most of the next day.

(*Id.* at PageID.317).

Plaintiff typically ate three meals a day (she could prepare "mostly microwave things"), did chores (which required her to take multiple breaks), and "spen[t] some time on the computer and phone playing games." (*Id.* at PageID.318–19). Plaintiff could only play games for "a short time due to back pain." (*Id.* at PageID.321). Plaintiff was "trying to bowl once a week" but it took her "the rest of the week to recover." (*Id.*). She occasionally helped care for pets by cleaning the litter box or throwing a toy for the dog. (*Id.* at PageID.318). Plaintiff struggled to physically care for herself, specifically she only showered once a week and cut her hair short for easier maintenance. (*Id.*). Before her onset date, Plaintiff was able to "[w]ork, take care of the house, go out with friends and family, shop, [and] reach." (*Id.*).

At the September 16, 2024 hearing, Plaintiff testified that she began working as an optician in 1998. (*Id.* at PageID.64). Though she tried to work as an optician and in other roles during the relevant period, these work attempts all ended within a few months due to her impairments. (*Id.* at PageID.64–69). The ALJ noted that it

11

"appear[ed] that all work after the alleged onset date was either an unsuccessful work attempt, or did not result in substantial gainful activity level earnings." (*Id.* at PageID.69).

Plaintiff has numerous diagnoses related to her musculoskeletal system and in combination they affected her ability to do "day-to-day activities" "[t]remendously." (*Id.* at PageID.72). She was unable to cook effectively because she could not stand at the stove or stand for long enough to do tasks like peel potatoes, she had to take frequent breaks to get through washing one meal's worth of dishes, she was unable to fully sweep or vacuum the floors in her 850-square foot house, and she took days to do laundry and often left it unfolded because folding took "forever" and "hurt[] so much." (*Id.*).

Plaintiff generally did her own housework but hired her cousin to do her yardwork. (*Id.* at PageID.72–73). Additionally, Plaintiff's partner sometimes helped her with personal care tasks including washing her hair and back due to her difficulty reaching behind her body. (*Id.* at PageID.76–77).

Plaintiff answered affirmatively when the ALJ asked her if it was "harder for [her] to manipulate very small items such as buttons, pennies or paper clips." (*Id.* at PageID.70). She could reach overhead with her left arm and partially with her right. (*Id.*). Plaintiff drove two to three times a week and needed to take a break if she had to drive more than an hour or hour and a half. (*Id.* at PageID.71). Plaintiff primarily

wore simple dresses and slip-on shoes due to her difficulties with buttons, zippers, and tying shoes. (*Id.* at PageID.77). She only wore bras if she had to go somewhere. (*Id.*).

Plaintiff's average pain was 5–6 out of 10, and on days she had to be more physically active, it rose to 8–9. (*Id.* at PageID.75–76). Plaintiff used muscle relaxers, Motrin 800, and over-the-counter Tylenol to take the edge off her pain. (*Id.* at PageID.76). Previously, she received spinal injections to help manage her pain, but her insurance no longer covered the injections. (*Id.*).

Plaintiff described her diabetes as "uncontrolled." (*Id.* at PageID.73). She suffered symptoms including sleepiness, tiredness, shakiness, cold sweats, nausea, and headaches. (*Id.*). Plaintiff had "a fear of needles" and used an autoinjector for insulin. (*Id.* at PageID.86). If Plaintiff needed an emergency insulin injection, her sister administered it. (*Id.*). Plaintiff also got "migraines a lot" for which she was prescribed an abortive medication to take at the onset of migraines. (*Id.* at PageID.79).

Further facts will be discussed as necessary below.

**F.    Governing Law**

The ALJ must "consider all evidence" in the record when making a disability decision. 42 U.S.C. § 423(d)(5)(B). The regulations, applicable to applications for disability benefits filed on or after the effective date of March 27, 2017, such as

Plaintiff's application here, distinguish between acceptable medical sources, medical sources, and nonmedical sources. An acceptable medical source means a medical source who is a:

(1) Licensed physician (medical or osteopathic doctor);

(2) Licensed psychologist, which includes:

    (i) A licensed or certified psychologist at the independent practice level; or

    (ii) A licensed or certified school psychologist, or other licensed or certified individual with another title who performs the same function as a school psychologist in a school setting, for impairments of intellectual disability, learning disabilities, and borderline intellectual functioning only;

(3) Licensed optometrist for impairments of visual disorders, or measurement of visual acuity and visual fields only, depending on the scope of practice in the State in which the optometrist practices;

(4) Licensed podiatrist for impairments of the foot, or foot and ankle only, depending on whether the State in which the podiatrist practices permits the practice of podiatry on the foot only, or on the foot and ankle;

(5) Qualified speech-language pathologist for speech or language impairments only. For this source, *qualified* means that the speech-language pathologist must be licensed by the State professional licensing agency, or be fully certified by the State education agency in the State in which he or she practices, or hold a Certificate of Clinical Competence in Speech-Language Pathology from the American Speech-Language-Hearing Association;

(6) Licensed audiologist for impairments of hearing loss, auditory processing disorders, and balance disorders within the licensed scope of practice only . . . ;

14

(7) Licensed Advanced Practice Registered Nurse, or other licensed advanced practice nurse with another title, for impairments within his or her licensed scope of practice . . . ; or

(8) Licensed Physician Assistant for impairments within his or her licensed scope of practice . . . .

20 C.F.R. § 404.1502(a) (2021). A medical source is

> an individual who is licensed as a healthcare worker by a State and working within the scope of practice permitted under State or Federal law, or an individual who is certified by a State as a speech-language pathologist or a school psychologist and acting within the scope of practice permitted under State or Federal law.

*Id.* § 404.1502(d). In contrast, a nonmedical source is "a source of evidence who is not a medical source." *Id.* § 404.1502(e). "This includes, but is not limited to: (1) [the claimant]; (2) Educational personnel (for example, school teachers, counselors, early intervention team members, developmental center workers, and daycare center workers); (3) Public and private social welfare agency personnel; and (4) Family members, caregivers, friends, neighbors, employers, and clergy." *Id.*

The Social Security Administration (SSA) "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from [the claimant's] medical sources." *Id.* § 404.1520c(a). "The most important factors [the SSA] consider[s] when evaluat[ing] the persuasiveness of medical opinions and prior administrative medical findings are supportability (paragraph (c)(1) of this section) and consistency (paragraph (c)(2) of this section)." *Id.* The SSA will consider several factors when

15

it contemplates "the medical opinion(s) and prior administrative medical findings" in a case.  *Id.* § 404.1520c(c).

The first factor is "supportability."  For this factor, "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be."  *Id.* § 404.1520c(c)(1).

The SSA will also consider the "consistency" of the opinion.  In essence, "[t]he more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be."  *Id.* § 404.1520c(c)(2).

In addition, the SSA will consider the source's "[r]elationship with the claimant."  *Id*. § 404.1520c(c)(3).  This factor includes analysis of:

(i)  Length of the treatment relationship.  The length of time a medical source has treated [the claimant] may help demonstrate whether the medical source has a longitudinal understanding of [the claimant's] impairment(s);

(ii)  Frequency of examinations.  The frequency of [the claimant's] visits with the medical source may help demonstrate whether the medical source has a longitudinal understanding of [the claimant's] impairment(s);

(iii)  Purpose of the treatment relationship.  The purpose for treatment [the claimant] received from the medical source may help

16

demonstrate the level of knowledge the medical source has of [the claimant's] impairment(s);

(iv)     Extent of the treatment relationship.  The kinds and extent of examinations and testing the medical source has performed or ordered from specialists or independent laboratories may help demonstrate the level of knowledge the medical source has of [the claimant's] impairment(s);

(v)      Examining relationship.  A medical source may have a better understanding of [the claimant's] impairment(s) if he or she examines [the claimant] than if the medical source only reviews evidence in [the claimant's] folder.

*Id.*

The fourth factor of the SSA's analysis is "specialization."  In making this determination, the SSA will consider

[t]he medical opinion or prior administrative medical finding of a medical source who has received advanced education and training to become a specialist may be more persuasive about medical issues related to his or her area of specialty than the medical opinion or prior administrative medical finding of a medical source who is not a specialist in the relevant area of specialty.

*Id.* § 404.1520c(c)(4).

Finally, the SSA will consider "other factors."  These may include any other information that "tend[s] to support or contradict a medical opinion or prior administrative medical finding."  *Id.* § 404.1520c(c)(5).  Other factors include "evidence showing a medical source has familiarity with the other evidence in the claim or an understanding of our disability program's policies and evidentiary requirements." *Id.*  Further, when the SSA considers "a medical source's familiarity

with the other evidence in a claim, [it] will also consider whether new evidence [it] receive[s] after the medical evidence source made his or her medical opinion or prior administrative medical finding makes the medical opinion or prior administrative medical finding more or less persuasive." *Id.*

As to the duty to articulate how persuasive the medical opinions and prior administrative medical findings are considered, the new regulations provide "articulation requirements." The ALJ will consider "source-level articulation." Pursuant to this requirement,

> [b]ecause many claims have voluminous case records containing many types of evidence from different sources, it is not administratively feasible for [the ALJ] to articulate in each determination or decision how [he or she] considered all of the factors for all of the medical opinions and prior administrative medical findings in [each] case record. Instead, when a medical source provides multiple medical opinion(s) or prior administrative finding(s), [the ALJ] will articulate how [he or she] considered the medical opinions or prior administrative findings from that medical source together in a single analysis using the factors listed in paragraphs (c)(1) through (c)(5) of this section, as appropriate.

*Id.* § 404.1520c(b)(1). The regulation reiterates that the ALJ is "not required to articulate how [he or she] considered each medical opinion or prior administrative finding from one medical source individually." *Id.*

The regulations stress that the "factors of supportability (paragraph (c)(1) of this section) and consistency (paragraph (c)(2) of this section) are the most important factors [the SSA] consider[s] when [it] determine[s] how persuasive [it] find[s] a

18

medical source's medical opinions or prior administrative medical findings to be."

*Id.* § 404.1520c(b)(2). As such, the SSA

> will explain how [it] considered the supportability and consistency factors for a medical source's medical opinions or prior administrative medical findings in [the claimant's] determination or decision. [The SSA] may, but [is] not required to, explain how [it] considered the factors in paragraphs (c)(3) through (c)(5) of this section, as appropriate, when [it] articulate[s] how [it] consider[s] medical opinions and prior administrative medical findings in [the claimant's] case record.

*Id.*

When medical opinions or prior administrative findings are "equally persuasive," "well-supported," and "consistent with the record" "about the same issue," "but are not exactly the same, [the ALJ] will articulate how [he or she] considered the other most persuasive factors . . . for those medical opinions or prior administrative medical findings in [the claimant's] determination or decision." *Id.* § 404.1520c(b)(3). The regulations clarify that the SSA is "not required to articulate how [it] considered evidence from nonmedical sources using the requirements of paragraphs (a)–(c) of this section." *Id.* § 404.1520c(d).

In addition, the regulations expressly state that the SSA will not consider "evidence that is inherently neither valuable nor persuasive" and "will not provide any analysis about how [it] considered such evidence in [its] determination or decision, even under § 404.1520c." *Id.* § 404.1520b(c). The regulations categorize evidence that is inherently neither valuable nor persuasive as: "[d]ecisions by other

19

governmental and nongovernmental entities"; "[d]isability examiner findings," meaning "[f]indings made by a State agency disability examiner made at a previous level of adjudication about a medical issue, vocational issue, or the ultimate determination about whether [the claimant is] disabled"; and "[s]tatements on issues reserved to the Commissioner[,]" including

> (i) Statements that [the claimant is] or [is] not disabled, blind, able to work, or able to perform regular or continuing work;
>
> (ii) Statements about whether or not [the claimant has] a severe impairment(s);
>
> (iii) Statements about whether or not [the claimant's] impairment(s) meet the duration requirement . . . ;
>
> (iv) Statements about whether or not [the claimant's] impairment(s) meets or medically equals any listing in the Listing of Impairments . . . ;
>
> (v) Statements about what [the claimant's] residual functional capacity is using [the SSA's] programmatic terms about the functional exertional levels . . . instead of descriptions about [the claimant's] functional abilities and limitations . . . ;
>
> (vi) Statements about whether or not [the claimant's] residual functional capacity prevents [the claimant] from doing past relevant work . . . ;
>
> (vii) Statements that [the claimant] [does] or [does] not meet the requirements of a medical-vocational rule . . . ; and
>
> (viii) Statements about whether or not [the claimant's] disability continues or ends when [the SSA] conduct[s] a continuing disability review.

*Id.* § 404.1520b(c)(3).

The regulations also provide that

> [b]ecause a decision by any other governmental agency or a nongovernmental entity about whether [a claimant is] disabled, blind, employable, or entitled to any benefits is based on its rules, it is not binding on [the SSA] and is not [its] decision about whether [the claimant is] disabled or blind under [SSA] rules.

*Id.* § 404.1504.   Therefore, the SSA "will not provide any analysis in [its] determination or decision about a decision made by any other governmental agency or a nongovernmental entity about whether [the claimant is] disabled, blind, employable, or entitled to any benefits." *Id.*  The SSA will, however, "consider all of the supporting evidence underlying the other governmental agency or nongovernmental entity's decision that [it] receive[s] as evidence in [a] claim . . . ." *Id.*

The regulations clarify that "[o]bjective medical evidence means signs, laboratory findings, or both." *Id.* § 404.1502(f).  Signs are defined as "one or more anatomical, physiological, or psychological abnormalities that can be observed, apart from [the claimant's] statements (symptoms)." *Id.* § 404.1502(g).  Further, "[s]igns must be shown by medically acceptable clinical diagnostic techniques. Psychiatric signs are medically demonstrable phenomena that indicate specific psychological abnormalities, e.g., abnormalities of behavior, mood, thought, memory, orientation, development or perception, and must also be shown by observable facts that can be medically described and evaluated." *Id.*  Laboratory

21

findings "means one or more anatomical, physiological, or psychological phenomena that can be shown by the use of medically acceptable laboratory diagnostic techniques," which "include chemical tests (such as blood tests), electrophysiological studies (such as electrocardiograms and electroencephalograms), medical imaging (such as X-rays), and psychological tests." *Id.* § 404.1502(c).

The most recent amendments to the regulations also tweaked the manner in which the SSA evaluates symptoms, including pain:

> In determining whether [the claimant is] disabled, [the SSA will] consider all [the claimant's] symptoms, including pain, and the extent to which [the] symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence. [The SSA] will consider all [the claimant's] statements about [his or her] symptoms, such as pain, and any description [the claimant's] medical sources or nonmedical sources may provide about how the symptoms affect [the claimant's] activities of daily living and [his or her] ability to work.

*Id.* § 404.1529(a). But the SSA clarified that

> statements about [the claimant's] pain or other symptoms will not alone establish that [the claimant is] disabled. There must be objective medical evidence from an acceptable medical source that shows [the claimant has] a medical impairment(s) which could reasonably be expected to produce the pain or other symptoms alleged and that, when considered with all of the other evidence (including statements about the intensity and persistence of [the claimant's] pain or other symptoms which may reasonably be accepted as consistent with the medical signs and laboratory findings), would lead to a conclusion that [the claimant is] disabled.

*Id.* Further, "[i]n evaluating the intensity and persistence of [the claimant's]

symptoms, including pain, [the SSA] will consider all of the available evidence, including [the claimant's] medical history, the medical signs and laboratory findings, and statements about how [the claimant's] symptoms affect [him or her]." *Id.* The SSA will "then determine the extent to which [the claimant's] alleged functional limitations and restrictions due to pain or other symptoms can reasonably be accepted as consistent with the medical signs and laboratory findings and other evidence to decide how [the claimant's] symptoms affect [his or her] ability to work." *Id.*

Finally, the SSA noted that "[b]ecause symptoms sometimes suggest a greater severity of impairment than can be shown by objective medical evidence alone, [it] will carefully consider any other information [the claimant] may submit about [his or her] symptoms." *Id.* § 404.1529(c)(3). This other information may include "[t]he information that [the claimant's] medical sources or nonmedical sources provide about [the claimant's] pain or other symptoms," such as "what may precipitate or aggravate [the claimant's] symptoms, what medications, treatments or other methods [the claimant uses] to alleviate them, and how the symptoms may affect [the claimant's] pattern of daily living," which "is also an important indicator of the intensity and persistence of [the claimant's] symptoms." *Id.*

> Because symptoms, such as pain, are subjective and difficult to quantify, any symptom-related functional limitations and restrictions that [the claimant's] medical sources or nonmedical sources report, which can reasonably be accepted as consistent with the objective

23

medical evidence and other evidence, will be taken into account . . . .
[The SSA] will consider all of the evidence presented, including
information about [the claimant's] prior work record, [the claimant's]
statements about [his or her] symptoms, evidence submitted by [the
claimant's] medical sources, and observations by [the SSA's]
employees and other persons.

*Id.* Factors relevant to a claimant's symptoms, such as pain, include:

(i)     [D]aily activities;

(ii)    The location, duration, frequency, and intensity of . . . pain or other symptoms;

(iii)   Precipitating and aggravating factors;

(iv)    The type, dosage, effectiveness, and side effects of any medication . . . taken to alleviate . . . pain or other symptoms;

(v)     Treatment, other than medication, . . . received for relief of . . . pain or other symptoms;

(vi)    Any measures . . . used to relieve . . . pain or other symptoms.

*Id.*

The new regulations also impose a duty on the claimant: "[i]n order to get benefits, [the claimant] must follow treatment prescribed by [his or her] medical source(s) if this treatment is expected to restore [his or her] ability to work." *Id.* § 404.1530(a). Stated differently, "[i]f [the claimant does] not follow the prescribed treatment without a good reason, [the SSA] will not find [the claimant] disabled or, if [the claimant is] already receiving benefits, [the SSA] will stop paying . . . benefits." *Id.* § 404.1530(b). Acceptable (or "good") reasons for failure to follow

prescribed treatment include:

(1)     The specific medical treatment is contrary to the established teaching and tenets of [the claimant's] religion;

(2)     The prescribed treatment would be cataract surgery for one eye, when there is an impairment of the other eye resulting in a severe loss of vision and is not subject to improvement through treatment;

(3)     Surgery was previously performed with unsuccessful results and the same surgery is again being recommended for the same impairment;

(4)     The treatment because of its magnitude (e.g., open heart surgery), unusual nature (e.g., organ transplant), or other reason is very risky for [the claimant]; or

(5)     The treatment involves amputation of an extremity, or a major part of an extremity.

*Id.* § 404.1530(c).

### G.    Argument and Analysis

As stated above, Plaintiff raises three issues but only the first two will be discussed.  First, she argues the ALJ erred by mischaracterizing Plaintiff's treatment as conservative.  Second, she argues that the ALJ improperly evaluated her subjective reports of symptoms under SSR 16-3p.

### 1.    Legal Standard

According to SSR 16-3p, an ALJ must analyze the consistency of the claimant's statements with other record evidence, considering his or her testimony about pain or other symptoms with the rest of the relevant evidence in the record and

25

other factors. SSR 16-3p, 2016 WL 1119029 (Mar. 16, 2016). This analysis and the conclusions drawn from it—formerly termed a credibility determination—can be disturbed only for a "compelling reason." *Sims v. Comm'r of Soc. Sec.*, 406 F. App'x 977, 981 (6th Cir. 2011); *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004).

The regulations establish a two-step process for evaluating subjective symptoms, including pain. 20 C.F.R. § 404.1529(a); SSR 16-3p, 2016 WL 1119029, at \*2. The ALJ evaluates complaints of disabling pain by confirming that objective medical evidence of the underlying condition exists. The ALJ then determines whether that condition could reasonably be expected to produce the alleged pain or whether other objective evidence verifies the severity of the pain. *See* 20 C.F.R. § 404.1529; SSR 16-3p, 2016 WL 1119029, at \*2; *Stanley v. Sec'y of Health & Hum. Servs.*, 39 F.3d 115, 117 (6th Cir. 1994). The ALJ ascertains the extent of the work-related limitations by determining the intensity, persistence, and limiting effects of the claimant's symptoms. SSR 16-3p, 2016 WL 1119029, at \*6.

"[A]n ALJ's findings based on the credibility of the applicant are to be accorded great weight and deference, particularly since an ALJ is charged with the duty of observing a witness's demeanor and credibility," as long as the assessment is supported by substantial evidence. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir. 1997); *see also Saunders v. Kijakzi*, No. 20-cv-12210, 2022 WL

26

885838, at *3 (E.D. Mich. Mar. 25, 2022) ("'It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant'" (quoting *Rogers.*, 486 F.3d at 247)).

### 2. Analysis

The ALJ summarized Plaintiff's report of symptoms as follows:

The claimant alleges disability based on a combination of mental and physical impairments. Specifically, complications from degenerative disc disease of the lumbar spine and cervical spine, cervical stenosis with radiculopathy status post fusion, diabetes mellitus, sclerotic changes of the left pelvis and arthritic changes of the SI joints, plantar fascial fibromatosis of right ankle, migraines, myofascial pain syndrome, polyarthritis, right biceps tendonitis, right shoulder impingement s/p arthroscopy, right artery stenosis, obesity, depressive disorder, anxiety disorder, and PTSD have precluded the claimant from performing work related activities. The claimant states that the cumulative effects of her various impairments are disabling. The claimant testified that she has problems with fine manipulation; she has problems picking up small items. The claimant testified that she has problems reaching overhead with her right arm. The claimant testified that she drives 2–3 times a week; she can drive short distances before she experiences impairment related symptoms. She has problems standing for extended periods; this causes her problems with cooking and performing other chores. The claimant can perform other tasks, but she has to plan ahead and take several breaks; she can still cook Thanksgiving dinner, but she has to start days in advance. She washes laundry, but she has problems folding it and putting it away. The claimant testified that she cannot do yard work. The claimant receives help from friends and family members to perform chores and other household activities.

The claimant testified that her diabetes was uncontrolled; she experiences fatigue, sweats, and she sweats and becomes shaky. The claimant also experiences nausea and headaches. The claimant testified that she also experiences issues related to her mental impairments. She has a depressed mood, and she experiences panic attacks. She has

problems with social interaction, and she is often overwhelmed in social situations. The claimant has to stand and walk after sitting for an extended period. The claimant testified that Motrin, muscle relaxers, and spine injections only lessened her pain. The claimant also experiences issues with concentration. The claimant also alleges additional exertional, postural, manipulative, environmental, and social, and mental limitations.

(ECF No. 5-1, PageID.38 (internal record citations omitted)). The ALJ found that

Plaintiff's reports were not entirely consistent with the medical evidence of record.

(*Id.*).

The ALJ went on to discuss why she made this finding. Relevantly, she

explained,

> The claimant stated during her consultative examination that her diabetes was uncontrolled due to her reluctance to take insulin because of her fear of needles. The claimant also stated that Zestril controlled her headaches. In May 2023, the claimant stated that her blood sugar levels still fluctuated but were more stable. The claimant has reported arthralgias, extremity pain, joint stiffness, and other impairment related symptoms. However, the claimant has also denied experiencing impairment related symptoms. In November 2022, the claimant presented for follow up treatment regarding her right shoulder. The claimant stated that she was "doing okay" but had moments where her pain increased when she moved her right arm a certain way; the claimant rated her pain at "2" on a ten point scale of intensity. The claimant stated that she was ready to go forward with the right shoulder arthroscopy because conservative measures were no longer providing relief; the claimant underwent the procedure on June 12, 2023. In August 2023, the claimant again reported her pain at "2" on a ten point scale of intensity and stated that he [sic] was hoping to start bowling again. In September 2023, the claimant stated that she was happy with her overall progress since the procedure. The claimant stated that she still experienced numbness and discomfort, but not as much as before the surgery; the claimant was also pleasantly surprised at her range of motion. The claimant further stated that she did not go to physical

28

therapy; she already knew the exercises and got therapy from working on the farm.

(*Id.* at PageID.39 (internal record citations omitted)).  To conclude her analysis on this issue, the ALJ wrote:

> As for the claimant's statements about the intensity, persistence, and limiting effects of his or her symptoms, they were considered using the factors contained in Social Security Ruling 16-3p, 20 CFR 404.1529(c), and/or 416.929(c)).  The claimant's allegations are inconsistent with the objective medical evidence and the claimant's activities of daily living. The claimant has received significant relief from use of a relatively static and conservative treatment regimen, despite her history of treatment non-compliance.  In addition, the claimant has reported a wide range of pain levels and of inconsistent severity during the relevant period.  Finally, while the claimant's impairments have reduced [her] participation in recreational and social activities, the claimant still completes activities of daily living.  The claimant retains the mental and physical capacity to take care of animals, work on a farm, independently complete physical therapy exercises, go bowling weekly, shop for groceries, drive a car, go places alone, perform some chores, handle her own finances, and prepare meals

(*Id.* at PageID.40 (internal record citations omitted)).

At first glance, the ALJ's decision appears sound.  However, when compared to the record evidence, it is apparent that the ALJ mis- or overstated the evidence that supported her conclusion.

First, Plaintiff's alleged onset date is June 1, 2023, yet the ALJ relies on records from a November 2022 appointment without explaining why this evidence is relevant to determining whether Plaintiff was disabled on and after her alleged onset date.  *See, e.g., Menge v. Comm'r of Soc. Sec. Admin.*, No. 11-CV-226, 2012

WL 3044285, at *8 (N.D. Ohio July 25, 2012) ("It is also unclear whether the ALJ looked to medical evidence outside of the relevant disability period in reaching his conclusion that Menge's condition was stable, and, if so, how such evidence was sufficiently probative."). Moreover, the ALJ did not fully summarize the November 2022 record. The ALJ wrote: "The claimant stated that she was 'doing okay' but had moments where her pain increased when she moved her right arm a certain way; the claimant rated her pain at '2'on a ten point scale of intensity." (*Id.* at PageID.39). The record, however, provides:

> She states that she is doing okay, but has moments where her pain increases to 8–9/10 when she moves her right arm a certain way. She rates her pain 2/10 on the pain scale when she is not doing a whole lot with her right shoulder and the pain is intermittent. She has pain all over her right shoulder as well as posteriorly.

(*Id.* at PageID.432). The ALJ's summation did not specify the degree of pain certain movements caused Plaintiff, despite providing the pain rating for when Plaintiff was not using her right shoulder.

Despite the ALJ referencing Plaintiff's farmwork multiple times in her decision, the Undersigned is unsure what such work entailed. Plaintiff mentioned getting her therapy working on the farm at a follow-up appointment with her orthopedic surgeon in September 2023 (*id.* at PageID.478), but there is no explanation as to what working on the farm means. The Undersigned was only able to locate one record where a specific activity related to farmwork was mentioned.

On July 12, 2023, Plaintiff's orthopedic surgeon urgently evaluated Plaintiff because she "reinjured her shoulder this past week when she was pulling up on a strap for [a] saddle." (*Id.* at PageID.463).  Thus, the only record evidence that the Undersigned could locate regarding what types of farmwork Plaintiff performed is a record that indicates she reinjured her shoulder adjusting a saddle.  The ALJ erred by finding that Plaintiff's ability to do farmwork cut against her without further developing the record to establish what types of farmwork Plaintiff was doing and if she was capable of performing such activities without injuring herself.

The ALJ also wrote: "The claimant retains the mental and physical capacity to take care of animals, work on a farm, independently complete physical therapy exercises, go bowling weekly, shop for groceries, drive a car, go places alone, perform some chores, handle her own finances, and prepare meals."  (*Id.* at PageID.40).  However, Plaintiff indicated in her function report that her significant other primarily cared for their pets and that she only occasionally helped to clean the litter box or throw a toy for the dog.  (*Id.* at PageID.318).  Similarly, she indicated that she prepared mostly microwave meals because she was unable to stand for long enough to do tasks like peel potatoes or cook at the stove.  (*Id.* at PageID.72, 318–19).  While Plaintiff did begin bowling again at some point following her right shoulder surgery, she said in her function report that she was "trying to bowl once a week" but it took her "the rest of the week to recover."  (*Id.* at PageID.321).  Thus,

these activities do not support a higher level of functioning than Plaintiff alleged.

Ultimately, "an ALJ's decision 'must contain specific reasons for the weight given to the individual's symptoms, be consistent with and supported by the evidence, and be clearly articulated so the individual and any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms.'" *Murray v. Comm'r of Soc. Sec.*, No. 17-cv-12586, 2018 WL 836480, at *3 (E.D. Mich. Feb. 13, 2018) (quoting SSR 16-3p, 2016 WL 1119029, at *9). The ALJ's decision here fails to meet these criteria. Her decision is rife with mis- and overstatements of the record evidence, which means it is neither consistent nor supported by the record. Further, the Undersigned is unable to follow the ALJ's reasoning with regard to her evaluation of Plaintiff's subjective symptoms because of these defects. Accordingly, the proper remedy is to remand this case for further administrative proceedings consistent with this opinion.

It is also unclear why the ALJ found that "the claimant has received significant relief from use of a relatively static and conservative treatment regimen, despite her history of treatment non-compliance." (*Id.* at PageID.40). Contrary to this finding, less than two weeks after her alleged onset date, Plaintiff underwent major surgery on her right shoulder. *See White v. Comm'r of Soc. Sec. Admin.*, 970 F. Supp. 2d 733, 755 (N.D. Ohio 2013) ("The undersigned agrees with Plaintiff that his treatment for his brain aneurysm and repair have been far from conservative."). While the ALJ

32

mentions Plaintiff's shoulder surgery earlier in her decision, her ultimate finding reflects a disconnect between her summation of the evidence and her findings.

In addition, the ALJ's finding that Plaintiff has a "history of treatment non-compliance" is troublesome. (*Id.*). "For this finding to be appropriate and consistent with SSR 16-3p, the ALJ should have considered the extent to which [Plaintiff's] failure to fully comply with treatment was justified or whether she had a valid explanation, which the ALJ failed to do." *Whitney H. v. Comm'r Soc. Sec. Admin.*, No. 3:23-CV-00039, 2024 WL 1090175, at *2 (S.D. Ohio Mar. 12, 2024). Here, it is unclear why the ALJ even made this finding.

To the extent it is premised on Plaintiff's diabetes, which was uncontrolled at times, Plaintiff is correct that the ALJ erred by failing to discuss how Plaintiff's well-documented fear of needles factored into this finding. *See James J. v. Comm'r of Soc. Sec. Admin.*, No. 3:20-CV-00422, 2022 WL 4285373, at *6 (S.D. Ohio Sept. 16, 2022) ("The Sixth Circuit has held that SSR 16-3p requires an ALJ to consider possible reasons why a claimant failed to seek medical treatment consistent with the degree of his or her complaints 'before drawing an adverse inference from the claimant's lack of medical treatment.'" (quoting *Dooley v. Comm'r of Soc. Sec.*, 656 F. App'x 113, 119 (6th Cir. 2016))). If this finding was based on other non-compliance, such non-compliance is not self-evident from the Undersigned's review of the record or the ALJ's opinion. This is also error warranting remand. *See Ryan*

33

*C. v. Comm'r of Soc. Sec. Admin.*, No. 3:21-CV-00069, 2022 WL 2526842, at *5 (S.D. Ohio July 7, 2022) ("The ALJ's heavy reliance on Plaintiff's noncompliance and conservative treatment, coupled with the ALJ's failure to develop the record and consider any of Plaintiff's reasons for not complying with treatment or seeking treatment consistent with the degree of his complaints, violates applicable Social Security rules and regulations, and constitutes reversible error."), *report and recommendation adopted*, 2022 WL 2905722 (S.D. Ohio July 22, 2022).

### H.    Conclusion

For these reasons, it is **RECOMMENDED** that Plaintiff's motion for summary judgment (ECF No. 7) be **GRANTED IN PART** and the Commissioner's motion (ECF No. 12) be **DENIED**.  If these recommendations are adopted, the ALJ's decision will be **VACATED** and this matter **REMANDED** for further administrative proceedings.

## III.   REVIEW

Pursuant to Rule 72(b)(2) of the Federal Rules of Civil Procedure, "[w]ithin 14 days after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations.  A party may respond to another party's objections within 14 days after being served with a copy."  Fed. R. Civ. P. 72(b)(2); *see also* 28 U.S.C. § 636(b)(1).  Failure to file specific objections constitutes a waiver of any further

34

right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this R&R. *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Dakroub v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc. Any objection must recite precisely the provision of this R&R to which it pertains. Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity. Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d). The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," etc. If the Court determines that any objections are without merit, it may rule without awaiting the response.

Date: June 16, 2026                              S/PATRICIA T. MORRIS
                                                 Patricia T. Morris
                                                 United States Magistrate Judge

35